# Ex Parte IRATACABLE

No. 3043

March 7, 1934.                    30 P. (2d) 284.

*L. D. Summerfield* and *Platt & Sinai,* for Petitioner:

*Henderson & Marshall,* Amici Curiæ:

*Gray Mashburn,* Attorney-General; *W. T. Mathews,* Deputy Attorney-General; and *Julian Thruston,* Deputy Attorney-General, for Respondent:

**OPINION**

By the Court, COLEMAN, J.:

The petitioner was arrested on a charge of operating, without a license, as a private motor carrier of property, for profit, for Nevada Packing Company, a corporation, engaged in wholesale distribution of meat on the public highways of this state, and running between the city of Reno, in Washoe County, and Carson City, in Ormsby County, and eleven miles south of the city of Reno; thereupon he sued out a writ of habeas corpus.

The legislature of this state, at its last session, enacted a law regulating the use of the public highways of the state, providing a license for the operation of motor vehicles thereover, and matters connected therewith, being chapter 165, Statutes of Nevada of 1933.

Section 1 of the act reads: "It is hereby declared to be the purpose and policy of the legislature in enacting this law to confer upon the public service commission of Nevada the power and authority, and to make it its duty to supervise, regulate and license the common motor carrying of property and/or passengers for hire, and to supervise for licensing purposes the contract motor carrying of property and/or of passengers for hire, and to supervise for licensing purposes the private motor carrying of property when used for private commercial enterprises on the public highways of this state, hereinafter defined, so as to relieve the existing and all future undue burdens on such highways arising by reason of the use of such highways by motor vehicles in a gainful occupation thereon, and to provide

for reasonable compensation for the use of such highways in such gainful occupations, and enable the State of Nevada, by a utilization of the license fees hereinafter provided, to more fully provide for the proper construction, maintenance and repair thereof, and thereby protect the safety and welfare of the traveling and shipping public in their use of the highways. * * * "

Section 2 reads: "(a) The term 'motor vehicle' when used in this act means any automobile, automobile truck, trailer, automobile tractor and semitrailer, motor bus, motorcycle, or any other self-propelled or motor driven vehicle, except hearses and ambulances, used upon any public highway of this state for the purpose of transporting persons or property. (b) The term 'common motor carrier of property' when used in this act shall mean any person engaged in the transportation by motor vehicle of property for hire as a common carrier conducting fixed route or on-call route operations. (c) The term 'contract motor carrier of property' when used in this act shall be construed to mean any person not a common motor carrier of property engaged in the transportation by motor vehicle of property for hire. (d) The term 'private motor carrier of property' when used in this act shall be construed to mean any person engaged in the transportation by motor vehicle of property, when engaged in wholesale occupations and/or the distribution, receiving and delivery of property in producing and commercial enterprises. (e) The term 'common motor carriers of passengers' when used in this act shall mean any person engaged in the transportation by motor vehicle of passengers or express for hire as a common carrier conducting fixed route or on-call route operations. (f) The term 'contract motor carrier of passengers' when used in this act shall be construed to mean any person not a common motor carrier of passengers engaged in the transportation by motor vehicle of passengers or express for hire. (g) The term 'public highway' when used in this act shall mean every public

street, road or highway or thoroughfare of any kind used by the public, but shall not include that portion of highways under construction or reconstruction. * * * "

Section 3 reads: "None of the provisions of this act shall apply to any motor vehicle operated wholly within the corporate limits of any city or town in the State of Nevada; nor to city licensed taxicabs operating within a ten-mile radius of the limits of a city or town; nor to the city or town draymen and private motor carriers of property operating within a two-mile radius of the limits of a city or town, nor to the transportation of live stock and/or farm products to market by the producer thereof, or such producer's employee, or merchandise and/or supplies for his own use in his own motor vehicle; nor to the transportation of children to and from school; nor to the transportation of highway contractor's own equipment in his own motor vehicle from job to job wholly within the confines of this state; nor to the transportation of ore or minerals in the producer's own vehicle; provided, however, only one vehicle with an unladened weight not exceeding 10,000 pounds, or two vehicles whose combined unladened weight does not exceed 10,000 pounds, shall be exempted for the transportation of ore or minerals or mining supplies; nor to the operation of a privately owned truck in personal services as distinguished from those using the highways in a gainful occupation shall be exempted; provided, however, this exemption shall be limited to one such vehicle not exceeding an unladened weight of five thousand pounds."

Section 4 provides that no common motor carrier of property or passengers, contract motor carrier of property or passengers, or private motor carrier of property shall operate any motor vehicle for transportation of either persons or property for compensation on any public highway except in accordance with the provisions of the act.

Section 5 provides that all "common motor carriers of property and/or of passengers," as defined in the act,

are declared to be common carriers within the meaning of the public utility laws of this state, and subject to the act in question and laws of the state.

Section 6 vests the public service commission with authority to license, supervise, and regulate every common motor carrier in all matters affecting the relationship between such carriers and the traveling and shipping public over and along the public highways of the state.

Section 7 provides that no common motor carrier of intrastate commerce shall operate without first obtaining from the public service commission a certificate of convenience, and paid all license fees and filed an indemnity bond.

Section 8 provides that no common motor carrier of interstate commerce shall operate within this state without paying a license fee and furnishing a liability policy.

Section 10 requires the public service commission to license and supervise for license purposes all "contract motor carriers of property and/or of passengers" and all "private motor carriers of property" either engaged in interstate or intrastate commerce, and such carriers are to obtain a license before doing business.

Section 17 provides that every person operating a motor vehicle in the carrying of persons or property for hire, or as a private carrier, shall procure a license to so operate, and section 18 fixes the basis for the license fees.

Section 16 requires that in issuing licenses provided for in section 18 the public service commission shall require the licensee to file an obligation to pay the compensation for injuries to third persons or their property resulting from the negligent operation of such carrier.

The act provides that all moneys paid pursuant to its terms shall go into the state highway fund for construction, maintenance, and repair of the public highways of the state. A violation of the act is made a misdemeanor, punishable by fine or imprisonment, or both.

Counsel for petitioner urge several reasons to support

their contention that the act in question is unconstitutional, the chief of which are: That it deprives petitioner of the equal protection of the law; that it violates the due process clause of the constitution; that it is arbitrarily and unreasonably discriminatory; that it deprives petitioner of his liberty and freedom in the selection of his business and in the acquisition and protection of his property; that it is violative of the state constitution, in that it is not general and uniform in its operation over the state; that the title of the act is violative of article 4, sec. 17, of our state constitution, in that it embraces more than one subject. It is also contended that the act is unintelligible and uncertain. No contention is made that the act violates any interstate commerce provision.

In disposing of this case we shall not refer to the many decisions cited in the briefs, because we feel that, in view of the existing condition, the reasoning and conclusions stated in Continental Baking Co. et al. v. Woodring (D. C.) 55 F. (2d) 347, affirmed by the supreme court in 286 U. S. 352, 52 S. Ct. 595, 76 L. Ed. 1155, 81 A. L. R. 1402, must control as to the main questions presented.

In considering some of the questions involved it is well, too, to bear in mind that the conditions in Nevada ·greatly accentuate the reasoning of the opinions in the case just cited. For instance, while Kansas has an area of 82,000 square miles, with a population of about 2,000,000, with many cities much larger than any in Nevada, and one with a population greater than the entire State of Nevada, Nevada's 90,000 population is scattered over an area of 40,000 square miles in excess of that of Kansas. From this statement it is readily seen what an enormous burden is imposed upon the taxpayers to maintain our highways.

1, 2. It is a matter of common knowledge that the trucking industry of this state has for years contributed meagerly to the support of the highways of the state, compared to the use it makes of them and the abuse resulting from such use. It is not only our duty to

indulge every presumption in favor of the constitutionality of the act in question, but to be loath to override' an act so wholesome and beneficent as the present one.

While counsel for petitioner have set out in their petition several theories upon which they contend that the act in question is unconstitutional, they confine their argument to three points, the chief one being that it is arbitrary and discriminatory, in that it excepts from its terms fourteen classes of motor carriers, as hereinafter designated.

Counsel insist that from a consideration of the act in the light of the express purpose, policy, and intent thereof, as expressed in section 1, every one of the fourteen exceptions create as much burden on the highways as those not exempted. They then take up and consider seriatim the fourteen exceptions mentioned.

3. Notwithstanding the contention of petitioner that the act is a police measure, demonstrated, as is claimed, by the language in section 1 to the effect that one of its purposes is to protect the safety and welfare of the traveling and shipping public in their use of the highway, we are of the opinion that it is an excise tax measure. A reading of section 1 demonstrates that its purpose is to "provide for reasonable compensation for the use of such highways * * * and enable the State of Nevada, by a utilization of the license fees hereinafter provided, to more fully provide for the proper construction, maintenance and repair thereof, and thereby protect the safety and welfare of the traveling and shipping public." These words demonstrate that the contention of counsel in this connection is erroneous—that the raising of funds for the construction, maintenance, and repair is *the* object sought from the revenue to be raised, and that the safety of the public sought to be promoted is incident to the maintaining of the highway in repair.

4. The right to classify motor vehicles for purposes of taxation is conceded, and the right to subclassify is well recognized. Commonwealth v. Clark, 195 Pa. 634,

46 A. 286, 57 L. R. A. 348, 86 Am. St. Rep. 694, affirmed in Clark v. Titusville, 184 U. S. 329, 22 S. Ct. 382, 46 L. Ed. 569; 1 Cooley Taxation (4th ed.) 748; Wingfield v. South Carolina Tax. Commission, 147 S. C. 116, 144 S. E. 846, 853, where many authorities are cited on the point.

5. The first class of motor vehicles claimed to be exempted under the statute, which counsel contends is an unreasonable and arbitrary discrimination, are hearses. It is true, as contended, that these vehicles are owned by private concerns; but we can see nothing arbitrary or unreasonable in this exemption in view of the existing known conditions, of which the legislature had knowledge and by which it is presumed to have been controlled. We must presume that the legislature knew that the cemeteries adjacent to cities are reached by traversing chiefly streets and highways not embraced in the public highway system, and that the use of the public highways by hearses is rare; whereas, this petitioner, comparatively speaking, to use the language of the court in Continental Baking Co. v. Woodring, supra, uses daily upon the public highways a fleet of trucks in the conduct of their business.

6. The next class of motor vehicles counsel contend are exempted, and thereby constitute an unreasonable and arbitrary discrimination, are ambulances. Again we think the legislature must be presumed to know that of our 90,000 population approximately 70,000 reside in the towns and cities exceeding 400 in population, where the hospitals are located, not requiring the use of the public highways to reach them, and that the population scattered in the remote regions without telephonic connections can take an injured person to a hospital in the same length of time it would take to go for an ambulance. In this situation it certainly cannot be said the legislature was either arbitrary or unreasonable in exempting this class.

7. The next class exempted, to which exception is taken, are motor vehicles operated wholly within the corporate limits of a city or town. The supreme court,

in Continental Baking Co. v. Woodring, supra, has pointed out why such an exemption is justified in incorporated municipalities. Both Reno and Carson City are thus incorporated. Petitioner is exempted along with all others, hence he cannot urge the point made as to this class, as it does not discriminate against him. Doolittle v. District Court, 54 Nev. 319, 15 P. (2d) 684.

8. The next class exempted by the act, and which it is claimed constitutes an arbitrary discrimination, are city licensed taxicabs operating with a ten-mile limit of a city or town. We think this act should be construed as limiting the operations of such taxicabs to a ten-mile radius of the city limits of the city or town licensing them. As so construed, we are unable to see that the exemption is either arbitrary or unreasonable. The members of the legislature, coming as they do from every section of this state, are familiar with the arid conditions thereof. They know that the land two or three miles beyond the city limits of substantially all of the cities and towns is arid and overgrown with sagebrush, that the population beyond such a point is scattered, and that the calls for taxicabs to go out to such localities are rare; and, furthermore, that beyond the city limits, in many instances, roads lead from such city which are not a part of the public highway system, and may be used largely in responding to such calls. They have a right, too, to take into consideration the fact that taxicabs are light and do practically no damage to the public highways, while, on the other hand, the trucks, to which are often attached heavy trailers, are in constant use and do a great deal of damage thereto.

9-11. The next class of motor vehicles exempted from the operation of the act, which is claimed to be an arbitrary and unreasonable discrimination, are city or town draymen operating within a two-mile radius of limits of a city or town. What we have said as to the taxicab exemption applies, to a great extent, to this class. In this connection, the legislature no doubt took

into consideration that usually there is quite a population just outside the city limits, reached by public ways not a part of the public highway system, a few of whom occasionally have need of a drayman operating a light vehicle, who finds it convenient to use the public highway to a limited extent. Why should it be an arbitrary discrimination to exempt such and not exempt the Nevada Packing Company's fleet of heavy trucks which use the public highways frequently every business day? The legislature is allowed a wide discretion in such matters, and we cannot say it has abused that discretion. The contention as to private motor carriers of property within a two - mile radius of a city is equally lacking in merit, and for the same reason.

12. The next class which it is claimed was arbitrarily exempted are the producers of livestock. Of course, the legislature in exempting this class took into consideration the extent to which this privilege is exercised, as well as other circumstances and the conditions. The livestock industry is one of the leading industries of the state, and we must assume that the legislature well knew that, except in rare instances, the livestock grower transports his product to market in large numbers and by railway. Distances are great in Nevada, and to contemplate the transporting of large quantities of livestock by motor vehicles once or twice a year would necessitate an undue investment in such vehicles for such rare use. Occasionally it may be desirable to transport a blooded bull by truck, or to use a truck to convey an animal to a nearby neighbor or butcher. In view of the conditions and customs of the ranchers, known to the legislature, we think the exemption not unreasonable or arbitrary. The exemption of this class by the Kansas act, in which state the conditions are far less favorable to the exemption, was upheld by the supreme court of the United States in Continental Baking Co. v. Woodring, supra.

13, 14. The next class which it is claimed was arbitrarily and unreasonably exempted from the operation of the act are those who transport to market their own

produce. The contention as to this exemption and the exemption in favor of those who transport supplies for their own use in their own vehicles is without merit, as shown by the Continental Baking Co. case mentioned. The same may be said as to the exemption of motor vehicles used in transporting children to and from school.

15. The next class which it is claimed is arbitrarily and unreasonably exempted by the terms of the act is the equipment of highway contractors. We see nothing unreasonable or arbitrary in this exemption. Highway contractors contract with the state or counties, and the same reasoning justifies the exemption of motor vehicles engaged in transporting children to and from school. Furthermore, such contractors use the highways to a very limited extent, as such an outfit is often engaged on one contract for many months.

16. It is next contended that the legislature arbitrarily and unreasonably exempted motor vehicles engaged in the transportation of ores or minerals in the producer's own vehicles. The same reason is urged against this exemption as is urged to motor vehicles used by the producers of livestock and farm products. It is said, too, that such exemption constitutes discriminations within discriminations, and that no constitutional reason exists for limiting the weight of vehicles used by such producers.

As pointed out in the case of Goldfield Con. M. & T. Co. v. Old Sandstorm Annex G. M. Co., 38 Nev. 426, 150 P. 313, mining is the paramount interest in this state. While it has been declared the paramount interest by the legislature, and is favored in every way, as a matter of public policy, and has been for many years a source of revenue to the state, during the period generally known as the "depression" but what might more accurately be called the "Gorge of Gloom," the revenue to the state from mining has been almost entirely wiped out. In view of this well-known fact and the further fact that mills are generally erected near the mines, for treating the ores, and that the public highways are used to but a very limited extent for the transportation of

ores, we cannot say that the exemption is either unreasonable or arbitrary. We think nothing more need be said in this connection.

17. As to the contention as to the exemption of the operator in transporting his mining supplies, much of what we have just said applies. Mines, as a rule, are not found on public highways, but in the mountain recesses, except where the town grows up around the mines, and public highways are traversed to a very limited extent in reaching them. The contention in this connection, as in some others, only serves to indicate the extremity to which petitioner, and those back of him, who are interested in the success of his cause, are driven.

18. The next class which it is claimed is arbitrarily and unreasonably exempted are privately owned trucks in personal services, limited to an unladened weight of 5,000 pounds. This class of vehicles is not used on the public highways as a place of business, and are operated thereon but little, as compared to those who use the public highways in a gainful occupation. Such an exemption was upheld in Carley & Hamilton v. Snook, 281 U. S. 66, 50 S. Ct. 204, 206, 74 L. Ed. 704, 68 A. L. R. 194, where the court said: "Only a word need be said of petitioner's contention that the exemption of all vehicles weighing less than 3,000 pounds, although their loaded weight may be much more than vehicles not exempt, infringes the equal protection clause of the fourteenth amendment and the similar section 21 of article 1 of the state Constitution. That the legislature may graduate the fees according to the propensities of the vehicles to injure or to destroy the public highways, and may exempt those with respect to which this tendency is slight or nonexistent, cannot be doubted. We may not assume that vehicles weighing less than 3,000 pounds, with loads which they usually carry, are not of this class, or that vehicles weighing more than 3,000 pounds with their accustomed burden added, do not have this tendency."

We find no merit in the contention.

19. It is said the act is not general and uniform in its operation. We find no word limiting the act to any portion or portions of the state, nor excluding or excepting any portions of the state from its operation. We do not see the slightest basis for this contention.

20, 21. Learned counsel say: "The 'and/or' provisions of this act—32 of them if our count is correct—render the act so hopelessly vague and uncertain that its true meaning and intent cannot be ascertained so that it can be fairly and justly enforced."

They make a terrible assault upon the use of "and/or," quoting from an editorial in the American Bar Association Journal for July, 1932, and from "an and/or Symposium" in the September Journal of 1932, wherein such eminent lawyers as John W. Davis and George W. Wickersham denounce the practice in unmeasured terms. Our attention is also directed to the language of the court in State v. Dudley, 159 La. 872, 106 So. 364, and in Preble v. Architectural Iron Workers' Union of Chicago, 260 Ill. App. 435, which disapprove the use of "and/or."

While we approve of all that has been said in condemnation of the use of "and/or," we do not think the act is so "hopelessly vague and uncertain" that we cannot gather therefrom the intent of the legislature. There are certain well-known rules which courts must never lose sight of, among which is that the intent of the legislature must control, and where the intent is doubtful resort may be had to rules of construction, among which are: (1) That the entire act must be looked to; (2) that punctuation and grammatical construction are only aids when a doubt exists as to the legislative intent; and (3) that an act must be construed so as to meet the plain, evident policy and purview of the act, and "bring it within the intention which the legislature had in view at the time it was enacted." Escalle v. Mark, 43 Nev. 172, 183 P. 387, 389, 5 A. L. R. 1512.

The clear purpose of the act is to raise revenue, and the provisions of a regulatory character are merely incidental; and it is clear, too, just what motor vehicle

operators are sought to be compelled to contribute to the maintenance of the public highways, and they are the ones who cause the greatest wear and tear.

22. Counsel appearing as amici curiæ make certain contentions, not urged in the brief of counsel for the petitioner, to the effect that the act in question is violative of our state constitution. This court has held in innumerable cases that one cannot urge the unconstitutionality of an act who is not affected thereby. Doolittle v. District Court, supra. No court raises such questions sua sponte, and, facetiously speaking, we do not think a genuine friend does. However, we will briefly dispose of the points made.

23, 24. The assertion that the title of the act embraces more than one subject is lacking in merit. It may be that the title is unduly prolix, but this does not make the connected matter a separate subject, nor otherwise violate section 17, art. 4, of the constitution. State ex rel. Dunn v. Com'rs. of Humboldt County, 21 Nev. 235, 29 P. 974. The title of an act must be liberally construed. In Re Calvo, 50 Nev. 125, 253 P. 671.

25. We do not think the legislature was misled by the drafter of the bill or by the committee into imposing license fees upon those embraced in subdivision (d) of section 2 of the act, as contended. Certainly section 4 of the act does not support such contention. It simply provides that none of the motor carriers named shall operate any motor vehicle for compensation except in accordance with the provisions of the act. In applying the act the several sections will be harmonized where possible to effectuate the intent of the legislature, and certainly no difficulty can arise in harmonizing section 4 with section 2.

26. There is nothing mysterious, obscure, uncertain, or misleading in section 17 of the act, when considered in connection with the act as a whole. Its sole purpose is to require the operators of the motor vehicles therein named to contribute to the maintenance of the public highways. Those who had complied with the law

existing at the time the act went into effect were exempted from a second payment—double taxation—for 1933, but those who had not complied with the law which was repealed by the act were made subject thereto for 1933.

We see nothing obscure in the portion of section 17 reading: "The license herein provided shall be secured and the fee therefor paid on or before the first day of January of each year, commencing January 1, 1934; provided, no person shall be deemed delinquent who has procured and paid for a license under the provisions of this act for and during the preceding year, until the first day of February of the new year * * *."

This sentence clearly means that those who procured and paid for a license during the year 1933 shall not be deemed delinquent in the procuring and paying for a 1934 license until the 1st day of February of 1934, and of each succeeding year in case a license was procured during the previous year.

For the reasons given these proceedings are hereby dismissed, and the petitioner is remanded to the custody of the officer.